# UNITED STATES DISTRICT COURT
for the

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched* )<br>*or identify the person by name and address)* )<br>Black and Purple iPhone )<br>Model: 14 ProMax )<br>IMEI: 359702376071716 ) | Case No. **24MJ2076** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
Attachment A-1

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment A-1

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC sec. 841, 846 | Drug Trafficking Conspiracy |
| 21 USC sec. 952, 960, 963 | Drug Smuggling Conspiracy |
| 18 USC 1956 | Money Laundering & Conspiracy |
| 31 USC 5332 | Bulk Cash Smuggling |

The application is based on these facts:
See attached affidavit, expressly incorporated herein.

☐ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Jacob Schneeberger*
*Applicant's signature*

HSI Special Agent Jacob Schneeberger
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____Telephone_____ *(specify reliable electronic means)*.

Date: 05/24/2024

*Judge's signature*

City and state: San Diego, California     The Hon. Lupe Rodriguez
*Printed name and title*

# AFFIDAVIT

I, Jacob Schneeberger, being duly sworn, hereby state as follows:

## I.

## INTRODUCTION

1. This affidavit supports an application for a warrant to search the following electronic device:

>Black and Purple iPhone
>Model: 14 ProMax
>IMEI: 359702376071716
>("**Target Device**")

as further described in Attachment A-1, and to seize evidence of crimes, specifically, violations of Title 21, United States Code, Sections 841 and 846, Conspiracy to Distribute Controlled Substances; Title 21, United States Code, Sections 952, 960, and 963, Conspiracy to Import Controlled Substances; Title 18, United States Code, Section 1956, Conspiracy to Launder Monetary Instruments; and Title 31, United States Code, and Section 5332, Bulk Cash Smuggling, as further described in Attachment B. The requested warrant relates to an investigation of Brittany MANGRUM, and others known and unknown, for criminal violations of the offenses identified above. The **Target Device** is currently in the custody of Homeland Security Investigations at 2055 Sanyo Avenue, Suite 120, San Diego, CA. 92154.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

//
//
//

## II.
## EXPERIENCE AND TRAINING

3. I am a "law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I have been a Special Agent with Homeland Security Investigations (HSI) since January 2016.

4. Prior to my assignment with HSI, I was employed as a United States Border Patrol Agent in San Diego, California from January 2003 to January 2016. I am a graduate of the Federal Law Enforcement Training Centers, located in Glynco, Georgia. I have successfully completed twelve months of combined formalized training in the Criminal Investigators Training Program, HSI Special Agent Training Program, and United States Border Patrol Academy. My training courses included but were not limited to criminal law, constitutional law, enforcement techniques, undercover operations, and search warrants.

5. As a federal law enforcement officer, I have participated in numerous investigations involving bulk cash smuggling, money laundering, the acquisition, importation, and distribution of controlled substances into and throughout the United States. As a result, I have performed assorted investigative techniques to include, physical and electronic surveillance, analytical analysis, custodial and non-custodial debriefs, and conducting undercover operations. I have applied for search and arrest warrants and submitted criminal complaints. Additionally, I am familiar with the communications and methodology used by narcotic traffickers, various concealment methods used to import controlled substances along the southwest border and proficient in identifying and defeating deceptive behaviors and actions taken by drug traffickers to disguise their criminal activities.

6. I am currently assigned to the Cartel Investigations Team in San Ysidro, California. My duties include investigating the trafficking of illicit controlled substances

and the importation and distribution of illegal substances in violation of Title 21 of the United States Code.

7. During the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of drug and bulk currency smugglers, in particular those who attempt to smuggle narcotics into the United States from Mexico and to smuggle bulk currency through the Southern District of California into Mexico.

8. This affidavit is based on my own investigation, my investigative team, oral and written reports by other law enforcement officers, physical surveillance, interviews, public records, database checks, searches, and other investigative techniques.

9. Based upon my training and experience working with CBP and as an HSI TFO, consultations with other law enforcement officers experienced in narcotics trafficking and money laundering investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Money launderers, drug traffickers, and couriers working for them often work in concert utilizing cellular telephones because the telephones are mobile and provide instant access to calls, text messaging capabilities, internet, and voice messages.

    b. Money launderers, drug traffickers, and couriers working for them often use cellular telephones to arrange the transportation of their illegal cargo.

    c. Money launderers, drug traffickers, and their couriers working for them often use cellular telephones to monitor the progress of illegal cargo while in transit.

    d. Money launderers, drug traffickers, and couriers working for them often use cellular telephones to provide instructions and to synchronize drops-off and pick-ups between drivers and stash-house operators (or others).

    e. Money launderers, drug traffickers, and couriers working for them often use cellular telephones to notify or warn accomplices of law enforcement activity,

including the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

10. Based upon my training, experience, consultations with law enforcement officers experienced in money laundering investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the transportation of narcotics and bulk currency:

    a. tending to indicate efforts to smuggle or otherwise distribute bulk currency or controlled substances;

    b. tending to identify accounts, facilities, storage devices, and services – such as email addresses, IP addresses, and phone numbers – used to facilitate the smuggling or distribution of bulk currency or controlled substances;

    c. tending to identify co-conspirators, criminal associates, or others involved in the smuggling or distribution of bulk currency or controlled substances;

    d. tending to identify travel to or presence at locations involved in the smuggling or distribution of bulk currency or controlled substances;

    e. tending to identify the user of, or person(s) with control over or access to, the **Target Device**; and/or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

4

## III.

## FACTS SUPPORTING PROBABLE CAUSE

11. HSI and law-enforcement partners have been conducting a long-term investigation into a drug-trafficking organization led by Jesus RUIZ-Sandoval, commonly known as "Chuy." RUIZ is a United States citizen who fled the United States for Mexico several years ago, in violation of terms of supervised release that were ordered as part of his sentence for a prior federal drug-trafficking crime.

12. For several years, RUIZ led a scheme that smuggled large quantities of cocaine and methamphetamine from Tijuana into San Diego via Ports of Entry, and then transported the drugs to Los Angeles to be held on a short-term basis. From Los Angeles, RUIZ's scheme transported the drugs to other locations in the United States; significant to this application, the cocaine was generally sent to the Mid-Atlantic United States on commercial trucks, for distribution in the Mid-Atlantic and Northeast United States. In turn, RUIZ's scheme arranged for the cash proceeds from these sales to be driven back to Southern California on commercial trucks and stashed on a short-term basis. From there, couriers smuggled large amounts of cash from Los Angeles through San Diego and into Tijuana, delivering it to RUIZ and coconspirators there.

13. In August 2023, a grand jury sitting in the Southern District of California indicted RUIZ on charges pertaining to drug smuggling, drug trafficking, and money laundering, in violation of 18 U.S.C. § 1956 and 21 U.S.C. §§ 841(a)(1), 846, 952, 960 and 963. More recently, in February 2024, RUIZ was indicted in a Superseding Indictment alleging these same offenses along with John Joe SOTO, Esteban Sinhue MERCADO, and other participants in the scheme. Contemporaneously, in January 2024, RUIZ, SOTO, MERCADO, and others were indicted by a grand jury in the Central District of California for a similar distribution scheme that involved international shipments of controlled substances and associated money laundering. *See United States v. Sandoval et al.*, 24-CR-008 AB (C.D. Cal.).

14. In this investigation, investigators have relied on a variety of different techniques to develop evidence of RUIZ's scheme. Investigators have conducted substantial amounts of surveillance in Southern California and other parts of the United States. They have obtained both text and voice communications of coconspirators, and they gathered information from individuals with firsthand knowledge of the scheme. They have obtained search warrants for geolocation information and for the contents of phones. And they have conducted seizures of more than $5 million in cash, and more than 196 kilos of cocaine, associated with the scheme.

15. Co-defendant MANGRUM is one of the individuals who worked to transport money from Southern California to Tijuana for RUIZ. Over the course of the investigation, investigators developed substantial evidence of her participation in this scheme. For example, in April 2021, investigators conducted surveillance of MANGRUM as she and another person met with a driver of a commercial truck in Van Nuys, California, in a car that MANGRUM had rented. As investigators watched, the person who had accompanied MANGRUM retrieved four large duffel bags from the truck and put them in the rental vehicle. About five and a half hours later, MANGRUM drove the rental vehicle into Tijuana, along with the individual who had accompanied her. MANGRUM drove the same vehicle back into San Diego several hours later. MANGRUM then conducted the same activity the next day, driving the rental vehicle into Mexico and returning just a few hours later.

16. Subsequently, investigators found that MANGRUM was in frequent communication with another individual who appeared to reside in East Los Angeles. Geolocation pings showed that in May 2021, MANGRUM's phone was located near this residence, and that she drove her 2020 Lexus SUV into Mexico the next day for about three hours. Investigators were later able to obtain text messages that MANGRUM sent and received, which tended to show that she visited the individual in East Los Angeles to receive cash for smuggling to Tijuana, for RUIZ. For example, in July 2021, MANGRUM wrote, "Chuy Just told me I have to meet you today at 3 lol." When the individual said they

had not heard from RUIZ, she responded, "Well I hope it doesn't happen! I hate going on Sundays traffic is hell" and added "Crossing :/" and "So try to make it not happen until tomorrow if you can." (I note that the day of these messages was in fact a Sunday.) Later, when MANGRUM confirmed that she needed to meet the individual, she asked, "Can we use your driveway to put it in cause he wants us to leave from here."

17. At the same time MANGRUM sent these last two texts, investigators saw her 2020 Lexus SUV backing into the driveway where the individual lived in East Los Angeles. Two people, matching the description of MANGRUM and the person who had accompanied her to meet the commercial truck in Van Nuys, were in it. The Lexus SUV stayed for about five minutes and then drove away. Except for a brief stop at a gym in Chula Vista, the Lexus SUV drove straight from Los Angeles to San Ysidro, where it departed for Mexico at about 7:00 p.m. Per cameras at the Port of Entry, MANGRUM was driving. About three and a half hours later, MANGRUM drove the Lexus SUV back into the United States and returned to the gym in Chula Vista. The other person who had accompanied her had apparently gone to this gym while she made the trip to Tijuana.

18. Subsequent messages sent by MANGRUM tended to confirm her ongoing travel into Mexico. In August 2021, she sent messages to the individual who had accompanied her to meet the commercial truck in Van Nuys. Among these messages, MANGRUM wrote, "Getting to the toll road . . . ." She then wrote, "Passed the toll road" and followed up with "Almost to the line," and then, "I hope it's empty," and then finally, "Positivity I crossed safely thank you thank you thank you." Later that day, MANGRUM wrote, "A[b]out 30 cars in front of me." I am aware that "the line" is a common reference for the international boundary line between the United States and Mexico, and assess that here, MANGRUM was expressing anxiety about crossing the border successfully.

19. DHS crossing records show that during the period MANGRUM appeared to work for RUIZ, she frequently crossed the border in a manner consistent with a bulk-cash courier. In 2020, it appears MANGRUM drove a vehicle into Mexico and returned within six hours on five different occasions. In 2021, this happened twenty-one times. In 2022, it

happened once, and it did not happen in 2023. From my own experience and my conversations with other experienced investigators, I am aware that bulk-cash couriers often travel into Tijuana for short periods of time, sufficient to deliver the cash and then return to the United States. Here, MANGRUM's border-crossing activity in 2021 is, I believe consistent with that of a person working as a bulk-cash courier. I also note that her crossing activity spiked in 2021, which tends to be consistent with the notion that she worked for RUIZ generally during that year.

20. On April 30, 2024, investigators arrested MANGRUM during a traffic stop, and took her into custody on an arrest warrant. During the stop, a uniformed police officer seized the **Target Device** from MANGRUM. Following her arrest, MANGRUM waived her *Miranda* rights and agreed to make a statement. MANGRUM admitted that she had transported large sums of money to Mexico on behalf of RUIZ. MANGRUM crossed the United States border into Tijuana and delivered the money to RUIZ in Tijuana. MANGRUM also said that she began working for RUIZ during the COVID-19 quarantine, and indicated that she had stopped working for him before the arrest. I am aware that the quarantine began around March 2020, and I assess that this statement is consistent with DHS records showing that MANGRUM was a frequent border-crosser in 2021.

21. Taking all the foregoing together, I believe MANGRUM was a long-term participant in RUIZ's scheme, working to bring him bulk cash beginning in 2020 and continuing through at least 2021. I further assess that her phone – the **Target Device** – is likely to contain evidence of that conduct. Text messages from MANGRUM tend to show that she used her phone for this purpose, and in light of the likely nature and extent of her activity, I anticipate additional such evidence is likely to be found on the device. I am also aware that the conduct I have described in this affidavit occurred largely in 2021, and it is possible that MANGRUM has purchased a new phone since then. However, I am also aware that when people obtain new phones, they often have the contents of their phones and remote-storage accounts uploaded to their new devices. For this reason, I assess that the **Target Device** is likely to have pertinent information on it.

22.     I seek authority to search the **Target Device** for the date range of December 1, 2020, through December 31, 2021. The evidence gathered to date tends to show that MANGRUM was a prolific courier for RUIZ during this period. At this time, I assess that this time period is an appropriate range to search for evidence of the activity of the scheme.

23.     I also seek authority to search the **Target Device** for evidence of the full range of offenses listed in the indictment and this warrant. As this warrant indicates, the specific investigation into MANGRUM has tended to show that her role in the scheme was to gather substantial amounts of drug-trafficking proceeds and smuggle them from the United States to Mexico for RUIZ. I am aware that, in and of itself, that is not evidence of MANGRUM committing substantive acts of drug smuggling or trafficking; it tends to show her participation in cross-border money laundering and bulk-cash smuggling. However, as set forth here, the investigation has found that RUIZ led a large and sophisticated scheme that imported large quantities of cocaine (and methamphetamine) and recouped the proceeds. And, I submit that efforts to recoup the grosses from drug distribution are, in and of themselves, actions forming part of trafficking and smuggling conspiracies. For this reason, I assess that the **Target Device** is likely to contain evidence of these conspiratorial activities.

## IV.
## BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT

24.     Based upon my experience and training, consultation with other law enforcement officers experienced in money laundering and drug investigations, and all facts and opinions set forth in this affidavit, I know that:

a.      Individuals involved in money laundering, bulk currency smuggling and drug distribution activity use cellular telephones and electronic communication devices to conduct their criminal activities. An examination of the **Target Device** will enable investigators to establish further evidence of drug distribution and importation, and co-conspirators. That evidence is, I believe, likely to include information pertinent to

9

importation of controlled substances, distribution of controlled substances, recoupment of proceeds from trafficking, and efforts to move those proceeds over the order to Mexico.

        b.     Cellular telephones and electronic communication devices (Tablets, I-Pads, etc.) are capable of storing many different types of data that are invaluable to investigators and could be evidence of criminal conduct. This data, sought pursuant to the requested search warrants, consists of the contents of the cell phones' or electronic communication device memory, including: stored names and telephone numbers in the memory, "phonebook" or list of contacts, and/or speed dial functions of the phone; phone numbers dialed for the most recent outgoing or "sent" calls of the telephone, along with date and time of call data; phone numbers dialing the telephone for the most recent incoming "received" calls, along with date and time of the call data; phone numbers dialing the telephone for the most recent "missed" calls, along with the date and time of call data; GPS navigation information; internet searches and websites viewed; and deleted data.

        c.     Money couriers and drug traffickers commonly use cellular telephones, blackberries, PDAs, electronic communication devices, other personal handheld electronic devices, laptop and desktop computers to communicate with, among others, their co-conspirators, customers, their suppliers, and other criminal associates, and to store phone numbers, text messages, emails, photographs, physical and email addresses, and other information that constitutes evidence of their drug trafficking activities. Money couriers and drug traffickers also commonly store records of their business moving bulk currency, distributing and selling drugs on telephones, computers, and other forms of digital media.

        d.     In addition to their use of computers and digital media, persons involved in money laundering and drug trafficking activity often use mobile phones in furtherance of these activities. When used in this manner, the mobile phones typically contain data constituting evidence of these activities. Many current mobile phones are sophisticated computing devices and are capable of performing many of the same functions as computers. They are commonly used in furtherance of illicit activity in the same manner as computers.

10

# V.

# PROCEDURE FOR ELECTRONICALLY STORED INFORMATION AS TO ANY CELLULAR TELEPHONES

25. It is not possible to determine, merely by knowing the cellular telephone make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

26. Following the issuance of this warrant, agents will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the **Target Device** and the memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

Case 3:24-mj-02076-LR   Document 1   Filed 05/24/24   PageID.13   Page 13 of 17

27. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## VI.
## PRIOR ATTEMPTS TO OBTAIN EVIDENCE

28. Investigators conducted a manual review of the **Target Device** on April 30, 2024, pursuant to consent provided by MANGRUM during her post-*Miranda* interview. In an abundance of caution, I have not relied on any evidence investigators may have observed in their manual review in this warrant application.

## VII.
## CONCLUSION

29. Based upon my experience and training, consultation with other law enforcement officers experienced in money laundering and drug trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that probable cause exists to conclude that the **Target Device**, as further described in Attachment A-1, incorporated herein, was utilized to facilitate violations of Title 21, United States Code, Sections 841 and 846, Conspiracy to Distribute Controlled Substances; Title 18, United States Code, Section 1956, Conspiracy to Launder Monetary Instruments; and Title 31, United States Code, Section 5332, Bulk Cash Smuggling. Furthermore, I believe there is probable cause to conclude that the **Target Device** contains stored data that constitutes evidence, fruits,

//
//
//
//
//
//

12

and instrumentalities of such violations, and I respectfully request a warrant be issued authorizing a search for and seizure of that data, as further described in Attachment B, incorporated herein.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Jacob Schneeberger*
Special Agent Jacob Schneeberger
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 this 24th day of May 2024.

_____ 3:31 p.m.
The Honorable Lupe Rodriguez
UNITED STATES MAGISTRATE JUDGE

13

**Attachment A-1**

*Item to be Searched*

The item to be searched is as follows:

    Black and Purple iPhone

    Model:14 ProMax

    IMEI: 359702376071716
    ("**Target Device**")

 

**Target Device** is currently in the custody of Homeland Security Investigations at 2055 Sanyo Avenue, Suite 120, San Diego, CA. 92154.

**Attachment B**

*Items to be Seized*

Authorization to search the **Target Device** described in Attachments A-1 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Device** for evidence described below. The seizure and search of the **Target Device** shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Device** will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, between the dates of **December 1, 2020,** up to and including **December 31, 2021**:

a. tending to indicate efforts to smuggle or otherwise distribute bulk currency or controlled substances;

b. tending to identify accounts, facilities, storage devices, and services – such as email addresses, IP addresses, and phone numbers – used to facilitate the smuggling or distribution of bulk currency or controlled substances;

c. tending to identify co-conspirators, criminal associates, or others involved in the smuggling or distribution of bulk currency or controlled substances;

d. tending to identify travel to or presence at locations involved in the smuggling or distribution of bulk currency or controlled substances;

e. tending to identify the user of, or person(s) with control over or access to, the **Target Device**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 21, United States Code, Sections 841 and 846, Conspiracy to Distribute Controlled Substances; Title 18, United States Code, Section 1956,

Conspiracy to Launder Monetary Instruments; and Title 31, United States Code, Section 5332, Bulk Cash Smuggling.